1  SCOTT N. SCHOOLS, SC SBN 9990
   United States Attorney
2  JOANN M. SWANSON, CSBN 88143
   Assistant United States Attorney
3  Chief, Civil Division
   EDWARD A. OLSEN, CSBN 214150
4  Assistant United States Attorney

5     450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102
6     Telephone: (415) 436-6915
      FAX: (415) 436-6927
7
   Attorneys for Defendants
8

9                  UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                       OAKLAND DIVISION

12  QIN CHEN,                          )
                                       )  No. C 07-2188-WDB
13              Plaintiff,             )
                                       )
14       v.                            )
                                       )
15  MICHAEL CHERTOFF, Secretary        )  **DEFENDANTS' MOTION FOR**
    of Department of Homeland Security; )  **SUMMARY JUDGMENT**
16  EMILIO T. GONZALEZ, Director of the )
    U.S. Citizenship and Immigration Services; )
17  CHRISTINA POULOS, Acting Director of )
    USCIS, California Service Center; and )
18  ROBERT S. MULLER, Director         )
    of Federal Bureau of Investigation, )
19                                     )
                Defendants.            )
20  _____

21              **I.  INTRODUCTION**

22       The plaintiff is a native and citizen of China who filed a Form I-485 application to adjust her

23  status to lawful permanent resident with the United States Citizenship and Immigration Services

24  (USCIS) on May 3, 2005.  The application has not yet been adjudicated.  On April 20, 2007, the

25  plaintiff filed an action in this Court, seeking an order directing USCIS to adjudicate her I-485

26  application.  The defendants hereby submit their motion for summary judgment.

27

28

# II. BACKGROUND

## A. Adjustment of Status

Section 245 of the Immigration and Nationality Act, codified at 8 U.S.C. § 1255, authorizes USCIS to adjust to permanent residence status certain aliens who have been admitted into the United States. However, adjustment of status is committed to the Attorney General's discretion as a matter of law. Section 1255(a) expressly provides:

> The status of an alien who was inspected and admitted or paroled int the United States ... *may* be adjusted by the Attorney General, *in his discretion* and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence[.]

8 U.S.C. 1255(a) (emphasis added).

Significantly, the statute does not set forth any time frame in which a determination must be made on an application to adjust status. Nor is any time frame specified in the regulations setting forth the procedures for aliens to apply to adjust status. *See* 8 C.F.R. § 245 et. seq.

While an I-485 application is pending, an applicant may apply for and receive employment authorization for the entire time that his or her I-485 application is pending. Declaration of Gerald Heinauer ¶ 24. Moreover, most I-485 applicants apply for and receive what is called "advance parole," which enables them to travel abroad during the pendency of their application. *Id.*

## B. Background Checks

Before an alien's I-485 application can be adjudicated, USCIS, in conjunction with the FBI, conducts several forms of security and background checks to ensure that the alien is eligible for the benefit sought and that he or she is not a risk to national security or public safety. Heinauer Declaration ¶ 9. These checks currently include: (1) an FBI name check, which is run against FBI investigative databases compiled by law enforcement agencies including administrative, applicant, criminal, personnel and other files; (2) an FBI fingerprint check, which provides information relating to criminal background within the United States; and (3) a check against the Interagency Border Inspection System (IBIS), which contains records and information from more than 20 federal law enforcement and intelligence agencies including the Central Intelligence Agency (CIA), FBI, the Department of State, DHS Customs and Border Protection (CBP) and other DHS agencies, and is used to compile information regarding national security risks, public safety

1    concerns, and other law enforcement concerns. *Id.*

2    These law enforcement checks have revealed significant derogatory information on various

3    alien applicants for immigration benefits, including applicants seeking permanent residency,

4    which has resulted in the alien being found ineligible for the benefit and USCIS's denial of the

5    application.  Heinauer Declaration ¶ 10.  These law enforcement checks have also resulted in

6    aliens being arrested by law enforcement agencies or charged with removability from the United

7    States.  *Id.*  In many instances, the disqualifying information on the alien has been discovered as a

8    result of the IBIS or FBI name checks.  *Id.*

9    Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and

10    thorough background checks on aliens who are seeking immigration status in the United States has

11    required procedures that sometimes result in individuals not receiving an adjudication of their

12    immigration application as quickly as in the past.  Heinauer Declaration ¶ 11.  In order to ensure

13    national security and public safety, as well as to reduce the waiting time for adjudication of

14    applications, USCIS is currently working with the Department of Justice and other agencies to

15    develop improved procedures that will ensure that all of the background checks are completed and

16    the results considered as quickly as possible.  *See id.*  However, the public safety requires USCIS

17    to make certain that the checks have been done before it adjudicates any application or petitions

18    and before it issues any immigration status documents to such persons.  *See id.*  USCIS will

19    continue to perform any outstanding background and security checks as expeditiously as possible

20    to ensure that no eligible alien must wait longer than is reasonably necessary to receive a decision

21    on his or her application or petition and to receive evidence of his or her immigration status.

22    Heinauer Declaration ¶¶ 11, 12.

23    Since September 11, 2001, the USCIS has submitted millions of name check requests to the

24    FBI, thus taxing that agency's resources and creating a backlog.  Heinauer Declaration ¶ 15.  Cases

25    in which the pending FBI name check is the only impediment to final adjudication are audited on a

26    weekly basis in order to identify those in which a response from the FBI has been received.

27    Heinauer Declaration ¶ 20.

28

**C. The FBI Name Check**

The FBI's National Name Check Program's mission is to disseminate information from the FBI's Central Records System (CRS) in response to requests from federal agencies such as USCIS. Declaration of Michael Cannon ¶ 4. The CRS contains the FBI's administrative, personnel and investigative files. *Id.* ¶ 5. The Program has grown exponentially since its genesis in the Eisenhower administration, with more and more customers (federal agencies, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies) seeking background information from FBI files on individuals before bestowing a privilege, such as government employment, a security clearance, attendance at a White House function, a green card or naturalization, admission to the bar, or a visa. *Id.* ¶ 4. More than 70 federal, state, and local agencies regularly request FBI name searches. *Id.*

When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. Cannon Declaration ¶ 11. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference file. *Id.* The names are searched in a multitude of combinations, switching the order of first, last and middle names, and so on. *Id.* If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. Cannon Declaration ¶ 12. If a search comes up with a match to a name and either a birth date or security number, it is designated an "Ident." *Id.*

There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination. Cannon Declaration ¶ 13. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the Name Check Programs on magnetic tapes. *Id.* The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Historically, during the batch processing stage, approximately 68 percent of name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72 hours. Cannon Declaration ¶ 13. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. *Id.*

1    The second stage in the process is name searching.  Cannon Declaration ¶ 14.  For the name

2    check requests that are still pending after the initial electronic check, additional review is required.

3    *Id.*  An FBI employee in the Name Check Program physically enters the applicant's name into the

4    computer database searching different fields and information.  *Id.*  A secondary manual name

5    search completed typically within 30-60 days historically identifies an additional 22 percent of the

6    USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate.  *Id.*

7    The results of this 22 percent also are returned to USCIS.  *Id.*

8    The third and fourth stages in the process are file review and dissemination.  Cannon

9    Declaration ¶ 15.  The remaining 10 percent are identified as possibly being the subject of an FBI

10    record.  *Id.*  At that point, the FBI record must be retrieved and reviewed.  *Id.*  If the record was

11    electronically uploaded in the FBI;s electronic record-keeping system, it can be reviewed quickly.

12    *Id.*  If not, however, the relevant information must be retrieved from an existing paper record.  *Id.*

13    Review of this information will determine whether the information is identified with the request.

14    *Id.*  If the information is not identified with the request, the request is closed as a "No Record" and

15    USCIS is so notified.  *Id.*  Additional searches against the FBI's Universal Index, additional

16    manual name searches, and/or additional file review of a name check request, depending on the

17    length of time a name check request is pending in the processing queue, may occur periodically

18    during the name check process to ensure that stale information is updated.  Cannon Declaration ¶

19    16.

20    Once a record is received, the FBI reviews the file for possible derogatory information.

21    Cannon Declaration ¶ 17.  Less than 1 percent of USCIS's requests are identified with a file

22    containing possible derogatory information.  *Id.*  If appropriate, the FBI forwards a summary of the

23    derogatory information to USCIS.  *Id.*

24    At each stage of the processing, the Name Check Program generally follows a first-in, first-

25    served protocol.  Cannon Declaration ¶ 18.  This protocol reflects that all applicants are equally

26    deserving and ensures that all applicants are treated fairly.  *Id.*  However, if an applicant's name

27    check requires a review of numerous FBI records and files, even though that person came in first,

28    the name check may require additional time until all responsive records are located and reviewed.

1   *Id.* The general exception to the first-in, first-served policy exists when USCIS directs that a name

2   check be handled on an "expedited" basis. Cannon Declaration ¶ 19. USICS determines which

3   name checks are to be expedited based on criteria it determines. *Id.* Once designated as an

4   "expedite," that name check proceeds to the front of the queue along with other prioritized name

5   check requests, in front of the others waiting to be processed. *Id.*

6      Prior to September 11, 2001, the FBI processed approximately 2.5 million name checks per

7   year. Cannon Declaration ¶ 21. As a result of the FBI's post-9/11 counterterrorism efforts, the

8   number of name checks has grown. *Id.* For fiscal year 2006, the FBI processed in excess of 3.4

9   million name checks. *Id.*

10      A significant portion of the incoming name checks submitted over the past few years has been

11   submitted by USCIS. Cannon Declaration ¶ 22. In fiscal year 2003, 64% of the total incoming

12   name checks were submitted by USCIS; in fiscal year 2004, 46% of the total incoming name

13   checks were submitted by USCIS; in fiscal year 2005, 45% of the total incoming name checks

14   were submitted by USCIS; in fiscal year 2006, 45% of the total incoming name checks were

15   submitted by USCIS. *Id.*

16      In November of 2002, heightened national security concerns prompted a review of the former

17   INS's procedures for investigating the backgrounds of individuals seeking immigration benefits.

18   Cannon Declaration ¶ 23. It was determined that deeper, more detailed clearance procedures were

19   required to protect the people and the interests of the United States effectively. *Id.* One of the

20   procedures identified was the FBI's name check clearance. *Id.* In December of 2002, and January

21   of 2003, the former INS resubmitted 2.7 million name check requests for background

22   investigations of all individuals with then-pending applications for immigration benefits for which

23   the Immigration and Nationality Act required background investigations. Cannon Declaration ¶

24   24. Those 2.7 millions requests were in addition to the regular submissions by the former INS. *Id.*

25   Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. *Id.*

26   Moreover, although many of the FBI's initial responses to those resubmitted requests indicated

27   that the FBI had no information relating to the specific individual who was the subject of the

28   request, approximately 16 percent – or over 440,000 — resubmitted requests indicated that the FBI

1  may have information relating to the subject of the inquiry.  *Id.*

2      The FBI's processing of those 440,000 resubmissions has delayed the processing of regular

3  submissions from USCIS.  Cannon Declaration ¶ 25.  A dedicated team with the FBI's National

4  Name Check Program has been assigned to handle only the re-submitted submissions from USCIS.

5  *Id*.  To the extent the team members are working on only these applications, they are unavailable

6  to process the normal submissions which are completed on a first-in, first-out basis, unless

7  otherwise directed by USCIS.  *Id*.

8      There are numerous factors that contribute to delays in the processing of name checks.  Cannon

9  Declaration ¶ 26.  One is the volume of incoming name checks – the total volume of name check

10  requests currently outpaces the FBI name check program's available resources to process the

11  incoming volume, in addition to being able to process those name checks currently pending.  *Id.*

12  As it concerns submissions by USCIS, the fiscal year 2006, USCIS submitted approximately

13  1,633,000 name check requests, of which approximately 718,000 represented naturalization-

14  related name checks and approximately 658,000 represented adjustment of status-related name

15  checks.  *Id*.  As of the end of fiscal year 2006, the Name Check Program had over 364,600 pending

16  USCIS name check requests, of which over 157,300 represented naturalization-related name

17  checks and over 157,800 represented adjustment of status-related name checks.  *Id.*

18      Second, the number of "hits" on a name when it is reviewed may further contribute to a delay

19  in processing a name check request.  Cannon Declaration ¶ 27.  A "hit" is a possible match with a

20  name in an FBI record.  *Id*.  The number of times the name appears in an FBI record correlates to

21  the number of records which require review.  *Id.*

22      Third, the processing of common names also contributes to a delay in processing a name check

23  request.  Cannon Declaration ¶ 28.  The names associated with a name check request are searched

24  in a multitude of combinations, switching the order of first, last, and middle names, as well as

25  combinations with just the first and last, first and middle, and so on.  *Id*.  Without detailed

26  information in both the file and agency submissions, it is difficult to determine whether or not a

27  person with a common name is the same person mentioned in FBI records.  *Id*.  Common names

28  can often have more than 200 FBI records.  *Id*.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2188 WDB                                    7

Fourth, the accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. Cannon Declaration ¶ 29. If the date of the record is later than October 1995, the record text may be available electronically; if the record predates October 1995, the paper record has to be located, pulled, and reviewed. *Id.* A record could be at one of year 265 possible locations across the country. *Id.* Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. *Id.* One person's name check may involve locating and reviewing numerous files, all at different physical locations. *Id.* Since is a paper-based process, it is a process subject to misplaced or misfiled files. *Id.* The process is time consuming and labor intensive. *Id.*

Fifth, processing a request to expedite the processing of an FBI name check means that an employee is not available to work on a normal name check request. Cannon Declaration ¶ 30.

The FBI is seeking a number of improvements to its process. Cannon Declaration ¶ 31. The FBI is continuing to develop its Name Check Dissemination Database, an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other agencies, and provide avenues for future automation of the name check process. *Id.* ¶ 32. The FBI is partnering with other agencies to provide contractors and personnel to process name checks. *Id.* ¶ 33. The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee can begin to significantly impact the name check workload. *Id.* ¶ 34. The FBI is scanning paper files required for review in order to provide machine readable documents for the Dissemination database and is building an Electronic Records System that allows for future automation of the name check process. *Id.* ¶ 35. The FBI is working with customers to streamline incoming product and to automate exchange of information. *Id.* ¶ 36. As a mid-term improvement, the FBI is exploring technology updates to the name check process. *Id.* ¶ 37. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. *Id.* As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. *Id.* ¶ 38.

1  The name check request from USCIS for the plaintiff was received by the FBI on May 18,

2  2005, and has not yet been completed.  Cannon Declaration ¶ 41.

3  **D. The Number of I-485 Applications the Nebraska Service Center Processes**

4  The plaintiff's I-485 application for adjustment of status is being processed by the Nebraska

5  Service Center, a component of USCIS.  Heinauer Declaration ¶ 3.  The Nebraska Service Center

6  currently has approximately 73,135 employment-based I-485 applications pending, about 17,741

7  of which are still awaiting completion of FBI name checks before they can be adjudicated.

8  Heinauer Declaration ¶ 20.  Of an additional 81,970 (estimated) pending asylum/refugee-based I-

9  485 applications, there are approximately 10,340 awaiting FBI name check responses.  *See id.*  Of

10  a total figure of 84,355 naturalization filings currently being processed at the Nebraska Service

11  Center, there are approximately 21,728 awaiting responses on FBI name checks.  *See id.*

12  **E. The Plaintiff's I-485 Application**

13  The plaintiff filed her I-485 application with USCIS on May 3, 2005.  Heinauer Declaration ¶

14  3.  On May 13, 2005, the USCIS submitted a name check request to the FBI.  Heinauer Declaration

15  ¶ 16, less than two weeks after the plaintiff filed her I-485 application.  Heinauer Declaration ¶ 16.

16  The FBI electronically acknowledged receipt of the name check request on May 18, 2005.

17  Heinauer Declaration ¶ 16; Cannon Declaration ¶ 41.  The FBI has not yet completed the

18  plaintiff's name check.  Cannon Declaration ¶ 41.

19  The plaintiff was fingerprinted by USCIS on December 10, 2005, and on April 10, 2007.[1]  The

20  preliminary IBIS checks have been completed, and any remaining IBIS checks will be performed

21  by the adjudicating officer at the time of final adjudication if deemed necessary.  Heinauer

22  Declaration ¶ 15.  The plaintiff currently holds a work authorization document which permits her

23  to work for any employer she wishes through July 17, 2008.  Heinauer Declaration ¶ 25.

24

25

26

---

27  [1]Multiple fingerprinting is performed to ensure that fingerprints, which must be less than
fifteen months old at the time any application or petition is adjudicated, remain current so that

28  the case will be adjudication-ready once the name check is completed.  Heinauer Declaration ¶
13.

### III.  SUMMARY JUDGMENT METHODOLOGY

This Court shall grant summary judgment when it finds that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).

### IV.  ARGUMENT

**A.   The Only Proper Defendant is Michael Chertoff**

Since March 1, 2003, the Department of Homeland Security has been the agency responsible for implementing the Immigration and Nationality Act.  *See* 6 U.S.C. §§ 271(b)(5), 557.  Thus, the only relevant Defendant here is Michael Chertoff, in his capacity as Secretary of the Department of Homeland Security, and Defendant Robert S. Mueller and other individuals listed in the caption should be dismissed.  *See Konchitsky v. Chertoff*, No. C-07-00294 RMW, 2007 WL 2070325, at *6-7 (N.D. Cal. July 13, 2007); *Dmitriev v. Chertoff,* No. C 06-7677 JW, 2007 WL 1319533, at *4 (N.D. Cal. May 4, 2007); *Clayton v. Chertoff*, C-07-2781-CW, 2007 WL 2904049, *3 (N.D. Cal. Oct. 1, 2007).

**B.   Relief Is Unavailable Under The Mandamus Act and the APA**

Mandamus is reserved for those situations in which the agency has a ministerial, nondiscretionary duty that is so plainly prescribed as to be free from doubt.  *See Kildare v. Saenz*, 325 F.3d 1078, 1084 (9th Cir. 2003).  A ministerial act is "devoid of the exercise of judgment or discretion."  *Harmon Cove Condominium Ass'n, Inc. v. Marsh*, 815 F.2d 949, 951 (3d Cir. 1987). A duty is ministerial "where the officer can do only one thing."  *Work v. United States*, 267 U.S. 175, 177 (1925).  Courts have consistently recognized that "the remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980).

Similarly, a court has jurisdiction to act under section 706(1) of the APA (authorizing courts to "compel agency action . . . unreasonably delayed") only when "an agency is compelled by law to act within a certain time period," but the agency has failed to comply with that time period.  *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004).  As an example, the Supreme Court in *Norton* stated that the Federal Communications Commission's failure to

1  establish regulations within 6 months of the date of the Telecommunications Act of 1996, as

2  required by the Act, "would have supported a judicial decree under the APA requiring the prompt

3  issuance of regulations."  *See id.*  "The principal purpose of the APA limitations we have

4  discussed – and of the traditional limitations upon mandamus from which they are derived – is to

5  protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial

6  entanglement in abstract policy disagreements which courts lack both expertise and information to

7  resolve." *Norton*, 542 U.S. at 66.

8      The adjudication of an adjustment of status application is a matter committed to the discretion

9  of USCIS.  *See* 8 U.S.C. § 1255(a) (an alien's status "may be adjusted by the Attorney General, in

10  his discretion and under such regulations as he may prescribe."); 8 C.F.R. § 103.2(b)(7) ("[The

11  agency] may direct any necessary investigation"); 8 C.F.R. § 103.2(b)(18) ("A district director

12  may authorize withholding adjudication"); 8 C.F.R. § 245.6 (an "interview may be waived . . .

13  when it is determined by the Service that an interview is not necessary").  Moreover, the

14  processing of an individual's name check is a matter committed to the discretion of the FBI. *See*

15  *Yan v. Mueller*, No. H-07-0313, 2007 WL 1521732, at * 6 (S.D. Tex. May 24, 2007) ("The

16  evidence shows that the delay is due, not only to the volume of requests that the FBI receives, but

17  also to the FBI's exercise of discretion in determining the timing for conducting the many name

18  check requests that it receives and the manner in which to conduct those checks."); *see also*

19  *Shalabi v. Gonzales*, No,. 4:06CV866-RWS, 2006 WL 3032413, at *5 (E.D. Mo. Oct. 23, 2006)

20  ("A background check that is rushed or incomplete due to an artificial court imposed deadline

21  would not meet the statutory and regulatory requirements of a 'full criminal background check'

22  before the USCIS can make a determination on an application."); *id.* ("There is no statute or

23  regulation which imposes a deadline for the FBI to complete a criminal background check.");

24  *Sozanski v. Chertoff*, No. 06-CV-0993, 2006 WL 4516968 (N.D. Tex. Dec. 11, 2006) (holding that

25  district court lacks jurisdiction to compel the FBI to perform name checks in adjustment of status

26  cases).

27      The agencies' discretion precludes judicial review of both the ultimate decision on an

28  individual's I-485 application *and* the process by which the decision is reached.  In *Heckler v.*

1  *Chaney*, 470 U.S. 821 (1985), the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that

2  "review is not to be had if the statute is drawn so that the court would have no meaningful standard

3  against which to judge the agency's exercise of discretion." *Id.* at 830.  As the Court went on to

4  explain, "if no judicially manageable standards are available for judging how and when an agency

5  should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of

6  discretion.'" *Id.* (emphasis added)*.*

7  Here, there are no statutory or regulatory provisions which provide a "meaningful standard"

8  against which to measure the time it takes the FBI to complete a name check or for USCIS to

9  process an application.  Without any mandatory time frames, in order to determine that the

10  agencies have "unreasonably delayed" adjudication of the plaintiff's I-485 application, this Court

11  would have to create a temporal standard from thin air.  This is a perilous task given the national

12  security considerations that affect the FBI's and USCIS's respective roles in the I-485 process.

13  Although USCIS must eventually notify an applicant of its decision on a I-485 application, *see* 8

14  C.F.R. § 245.2, the applicant is not entitled to a decision within any particular time frame.  *See*

15  *Sharif v. Chertoff*, 497 F. Supp. 2d 928, 2007 WL 2045489, at * 5 (N.D. Ill. July 18, 2007).

16  Congress clearly knows how to provide a deadline for processing an application for an

17  immigration benefit, but chose to remain silent in the context of I-485 applications.  For example,

18  Congress provided that an application for naturalization must be processed within 120 days after

19  the date the applicant is examined.  *See* 8 U.S.C. § 1447(b).  The Immigration and Nationality Act

20  provides no time frame for processing an I-485 application.  Accordingly, under *Norton*, this Court

21  is unable, under either the mandamus statute or the APA, to direct USCIS to act within a specific

22  time period on the plaintiff's I-485 application.  *See Norton*, 542 U.S. at 65.

23  Finally, the granting of a writ of mandamus to compel the processing of routine immigrant

24  applications out of order would have several negative repercussions.  First, it would unfairly favor

25  applicants with the means to hire an attorney and file federal mandamus actions.  Applicants

26  without the resources to bring such actions would suffer further delays in the processing of their

27  applications, because other later-filed applications would be given court-mandated preferential

28  treatment.  Second, allowing immigration applicants to use mandamus to "cut in line," would open

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2188 WDB                    12

1  the floodgates for immigration-related mandamus actions. The use of mandamus in immigration

2  matters would shorten the delay for some, only to lengthen it for others.  An equitable solution to

3  the processing delays lies not with the Judicial branch, but with the Executive and Legislative

4  branches of government, for only these branches of government can properly address the budget

5  and staffing issues that have caused the delays to occur.

6      In sum, the defendants have no clear, mandatory duty to process a name check or to adjudicate

7  the plaintiffs' I-485 application within any particular time frame.  In failing to specify any

8  temporal limitations, and in leaving it to the agency to prescribe any appropriate regulations,

9  Congress vested the agencies with complete discretion over the process of adjudicating an I-485

10  application.  Accordingly, this Court lacks jurisdiction over the plaintiff's mandamus and APA

11  claims.  *See Li v. Chertoff*, 482 F. Supp. 2d 1172, 1177 (S.D. Cal. 2007); *Zheng v. Reno*, 166 F.

12  Supp. 2d 875, 880-81 (S.D.N.Y. 2001) ("Matters within the INS's discretion are not reviewable

13  under the mandamus statute.  Thus, courts in this district have repeatedly held that mandamus

14  relief is unavailable for delays in the adjustment process."); *Safadi v. Howard*, 466 F. Supp. 2d

15  696, 698-700 (E.D. Va. 2006) (concluding that § 1255(a) vests USICS with discretion over the

16  entire process of adjustment application adjudication); *Grinberg v. Swacina*, 478 F. Supp. 2d

17  1350, 1351 (S.D. Fla. 2007) ("Sections 242 and 245 of the Immigration and Nationality Act . . .

18  preclude judicial review of any discretionary "decision or action' of the Attorney General in

19  immigration matters," including the pace at which immigration decisions are made.).[2]

20

21

22      [2]The defendants acknowledge that a number of other courts, including the judges in this
district that have considered the issue, have held to the contrary.  *See, e.g., Dong v. Chertoff*, C-

23  07-266-SBA, 2007 WL 2601107 (N.D. Cal. Sept. 6, 2007); *Soneji v. DHS*, C-07-2290-SC, 2007
WL 3101660 (N.D. Cal. Oct. 22, 2007); *Clayton v. Chertoff*, C-07-2781-CW, 2007 WL 2904049

24  (N.D. Cal. Oct. 1, 2007)  *Konchitsky v. Chertoff*, C-07-0294, 2007 WL 2070325, at *3 (N.D. Cal.
July 13, 2007); *Toor v. Still*, C-07-0645-BZ, 2007 WL 2028407 (N.D. Cal. July 10, 2007); *Fu v.*

25  *Gonzales*, C-07-0207, 2007 WL 1742376 (N.D. Cal. May 22, 2007); *Dmitriev v. Chertoff*, C-07-
7677-JW, 2007 WL 1319533 (N.D. Cal. May 22, 2007); *Wu v. Chertoff*, C-06-7880-SI, 2007 WL

26  1223858 (N.D. Cal. April 25, 2007); *Baker v. Still*, C-06-7456-MEJ, 2007 WL 1393750 (N.D.
Cal. May 9, 2007); *Gelfer v. Chertoff*, C-06-6724-WHA, 2007 WL 902382 (N.D. Cal. March 22,

27  2007); *Singh v. Still*, 470 F. Supp. 2d 1064, 1067 (N.D. Cal. 2007); *Yu v. Chertoff*, C06-7878-

28  CW, 2007 WL 1742850 (N.D. Cal. June 14, 2007) *Yu v. Brown*, 36 F. Supp. 2d 922, 932
(D.N.M. 1999).

**C.  8 U.S.C. § 1252(a)(2)(B)**

This Court is also barred from reviewing this action under 8 U.S.C. § 1252(a)(2)(B), which

provides:

(B) Denials of discretionary relief

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, **no court shall have jurisdiction to review --**
>
> (i) **any judgment regarding the granting of relief** under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
>
> (ii) **any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security**, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B) (emphasis added)

8 U.S.C. § 1255, to which 8 U.S.C. § 1252(a)(2)(B) refers, provides:

> (a) Status as person admitted for permanent residence on application and eligibility for immigrant visa
>
> **The status of an alien** who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification as VAWA self-petitioner **may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe**, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255 (emphasis added).

The reference in 8 U.S.C. § 1252(a)(2)(B)(ii) to "action of the Attorney General or the

Secretary of Homeland Security" encompasses the pace at which USCIS processes an I-485

application.  In *Safadi v. Howard*, 466 F. Supp. 2d 696 (E.D. Va. 2006), for example, the United

States District Court for the Eastern District of Virginia concluded that the term "action,"

"encompasses any act or series of acts that are discretionary within the adjustment of status

process . . . action . . . encompasses the entire process of reviewing an adjustment application,

including the completion of background and security checks and the pace at which the process

proceeds." *Safadi*, 466 F. Supp. 2d at 699; *see also Grinberg v. Swacina*, 478 F. Supp. 2d 1350

1  (S.D. Fla. 2007) (electing "to follow the majority of courts that have dismissed similar actions for

2  lack of subject matter jurisdiction, under the rationale that Sections 242 and 245 of the [INA], 8

3  U.S.C. §§ 1255(a), 1252(a)(2)(B)(ii) (2006, as amended in 2005, preclude judicial review of any

4  discretionary 'decision or action' of the Attorney General in immigration matters"); *Li v. Chertoff*,

5  482 F. Supp. 2d 1172, 1177 (S.D. Cal. 2007) ("These statutes clearly convey Congress' intent to

6  preclude courts from reviewing discretionary decisions or actions of USCIS regarding I-485

7  applications"); *Eldeeb v. Chertoff*, No. 8:07-CV-236-T-17EAJ, 2007 WL 2209231, at *13 (M.D.

8  Fla. July 30, 2007) ("Therefore, this Court has elected to interpret the § 1252(a)(2)(B)(ii)

9  jurisdictional bar broadly, and has concluded that the pace of adjudication of an 1485 application

10  is a discretionary function of the CIS").  *But see Dong v. Chertoff*, C-07-266-SBA, 2007 WL

11  2601107 (N.D. Cal. Sept. 6, 2007) (rejecting argument that 8 U.S.C. § 1252(a)(2)(B)(ii) deprives

12  the court of jurisdiction to hearing a claim that an adjudication of an adjustment of status

13  application has been unlawfully withheld); *Cao v. Upchurch*, 496F. Supp. 2d 569, 2007 WL

14  2071900, at *2 (E.D. Pa. 2007) ("While 8 U.S.C. § 1255(a) specifically places the decision of

15  whether to adjust status in the discretion of the Attorney General, it says nothing about the pace of

16  such a decision, and certainly does not confer on the Attorney General discretion to let a petition

17  languish indefinitely").

18      In sum, the defendants respectfully ask this Court to conclude that it lacks jurisdiction pursuant

19  to 8 U.S.C. § 1252(a)(2)(B)(ii) to review the pace at which the FBI and USCIS complete the name

20  check and adjudicate the plaintiff's I-485 application.

21  **D.  The Delay is Reasonable**

22      Even if this Court were to find jurisdiction, the defendants have not unreasonably delayed

23  adjudication of the plaintiff's' I-485 application.

24      First, the USCIS promptly asked the FBI to conduct a name check of the plaintiff on May 13,

25  2005, within two weeks of when the plaintiff filed her I-485 application on May 5, 2005.  Heinauer

26  Declaration ¶ 16; Cannon Declaration ¶ 4.  Accordingly, the plaintiff cannot establish any delay in

27  initiating the name check process.

28      Second, while waiting for the completion by the FBI of the plaintiff's name check, the USCIS

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
C 07-2188 WDB                    15

1   has processed the plaintiff's fingerprints on two occasions – on December 10, 2005, and on April

2   10, 2007 – to ensure that her fingerprints are current and that her I-485 application will be

3   adjudication-ready when the FBI completes the plaintiff's name check.  Heinauer Declaration ¶ 13.

4       Third, while waiting for the completion by the FBI of the plaintiff's name check, the USCIS

5   has completed the plaintiff's preliminary IBIS checks.  Heinauer Declaration ¶ 14; Heinauer

6   Declaration ¶ 9.

7       Fourth, the Declaration of Michael Cannon thoroughly documents the staggering number of

8   name check requests the FBI receives on a yearly basis (in fiscal year 2006 alone, the FBI

9   processed 3.4 million name checks), the reasons for the delays that the FBI experiences in

10  processing name checks requests, and the steps the FBI has taken and will take to address the

11  factors that contribute to delays in processing a name check.  Cannon Declaration ¶¶ 21, 22, 26-30,

12  31-39.

13      Fifth, any requirement that the FBI or USCIS process the plaintiff's name check or I-485

14  application within a particular time limit will have the unfortunate side effect of slowing the

15  processing for other applicants who are also awaiting action on their applications for immigration

16  benefits.  Heinauer Declaration ¶ 21.  Absent compelling reasons, moving some individuals to the

17  front of the queue would simply move that group ahead of others who also had been waiting,

18  resulting in no net gain in processing.  *Id.*

19      Sixth, during the time that an I-485 application is pending, an applicant may apply for and

20  receive employment authorization for the entire time that his or her I-485 application is pending.

21  Herring Declaration ¶ 18, as well as permission to travel abroad during the pendency of the I-485

22  application.  Heinauer Declaration ¶ 25.  The USCIS has provided the plaintiff with work

23  authorization through July 17, 2008.  *Id.*  The plaintiff does not have a pending application for

24  permission to travel.  *Id.*

25      In sum, given the large volume of applications USCIS must adjudicate, the extensive

26  background check that is required for national security and public safety, the exponential growth

27  in the number of name checks the FBI must complete, the limited resources available to the

28  agencies, and the documented steps the FBI has taken to complete the plaintiff's name check, the

1  FBI and the USCIS are proceeding in an orderly and timely fashion with the completion of name

2  check and the adjudication of the plaintiff's I-485 application.

3                                    **V. CONCLUSION**

4      For the foregoing reasons, the defendants respectfully ask this Court to grant the defendants'

5  motion for summary judgment, and dismiss the plaintiff's action in its entirety.

6

7

8  Dated:  November 9, 2007                    Respectfully submitted,

9                                              SCOTT N. SCHOOLS
                                               United States Attorney
10

11

12                                                /s/
                                               EDWARD A. OLSEN
13                                             Assistant United States Attorney
                                               Attorneys for Defendants
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28